We welcome you all here today. Glad you made it up through the elevators. Call your congressman and tell him to fix this building or else give us a new one. They've got money for everything. So it's very frustrating. Seriously, however, we appreciate if you will pay attention to the traffic light system. A yellow light comes on when you have two minutes left in your argument. And as many of you are well aware, and when the red light comes on, we ask you to conclude unless you're answering questions from the court. We have read your briefs and record excerpts. We have not necessarily read the entire record of the case, so we very much appreciate record citations. The first case of the morning is number 18, 31213, U.S. v. Staggers, Morrison and Session. We'll hear first from Ms. Kuhn, representing Morrison. Good morning, your honors. May it please the court. My name is Samantha Kuhn and I represent Leonard Morrison in this case. Mr. Morrison was convicted of a single count of felon in possession of a firearm in this case, based on a gun that was found in his house during a warrantless search. That conviction needs to be vacated no matter what in light of rehafe for the reasons provided in the briefing. But with the court's permission, I'd like to focus today on the reasons why the suppression ruling needs to be reversed and why this court should order the district court to enter a judgment of acquittal for Mr. Morrison. There were several issues and errors in the district court suppression ruling in this case, which are discussed in detail in the briefing. But what this case really boils down to is the government completely failed to establish that the officers had consent to enter Mr. Morrison's house from Ms. Jupiter, much less that they had voluntary consent from her. At best, even considering the officer's testimony in a light most favorable to government and setting aside the fact that the district court failed to make critical factual findings and resolve disputes, at best the evidence shows a submission to lawful authority by the officers who walked into the house without a warrant, without requesting permission, and without receiving an affirmative invitation to come inside. Now the facts of this case are largely undisputed leading up to the entry into the house. A team of eight officers went to Mr. Morrison's house at 6 in the morning, and one officer testified at trial that they specifically intended to get there while he was still sleeping to put things on the officer's side. Well, that's what they typically do on these things, right? There's nothing new about that. Well, consistent with what their expectation was, everybody was sleeping inside. And so they knock on the door looking for Mr. Morrison, and instead Ms. Jupiter answers the door, a woman that they don't know and they haven't identified through their investigations. She answers the door, she opens it slightly for the officers to talk to them, and they ask if Mr. Morrison is there. And she tells them that he's inside sleeping. And at that point, they walk straight into the house and stand in the living room. Well, now that's not exactly what the district court found. The district court found that she failed to verbally object and that there was no physical force executed by the officers in pushing their way into the house. But the district court did not make a resolution of the factual dispute between Ms. Jupiter and the officers regarding whether she opened the door a little bit wider, or if she actually was closing the door and they pushed their way through. But after the trial, she made an additional finding about that, didn't she? Not directly on that, but that it was voluntarily opened? In her, and I apologize, I can't recall her specific findings at the end of the trial. But as far as suppression goes, the only new information that was produced at the trial was more testimony from one of the officers at the scene who indicated that when she opened the door a little bit wider, he took that as implied consent to come in. There was no additional testimony or information provided at the trial that supported a finding of voluntary consent for them to enter. So considering the factual dispute between Ms. Jupiter and the officers, the court never made any kind of resolution of that fact. And even setting aside additional findings, her decision was based solely on the fact that Ms. Jupiter failed to verbally object to the officers entering the house, and that there was no physical confrontation or forced entry from that perspective, or a physical assault, basically, from the officers. If we agree with your view that the district court didn't resolve some of these factual disputes, should we remand to get resolution? I think you note that as an alternative. Normally, that would be the remedy that would be required here, because that's a central dispute, and because Ms. Jupiter's testimony clearly describes a non-consensual entry and a Fourth Amendment violation. But the issue here is that the court should actually reverse the suppression ruling, because even looking at the disputed fact from the officer's perspective, that can't possibly support a preponderance of the evidence finding of implied consent, much less voluntary consent by Ms. Jupiter. Well, there are cases that say if the person opened the door wider to go in, and the officer came in, that could indicate implied consent. Those cases all involve some kind of either explicit request from the officers for consent, and based on the totality of the circumstances, the opening of the door and the other surrounding circumstances indicate that they are consenting to that request. Here, there was no request. So basically, are you saying there have to be magic words? We're not saying that there have to be magic words, and that's a misconception that's brought up in the government's brief. The government suggests that we're arguing that there is never consent unless the officers have said some specific words to request affirmative consent. That's not what we're arguing at all. We're arguing that based on the totality of the circumstances in this case, and when you have a situation like here, where there is no actual request for consent, there's no affirmative invitation from the person inside. Well, let's say we want to talk to Morrison, and at some point within a few seconds, Morrison starts coming out of the bedroom. So they're sort of confronting him, whether they do it exactly as one of the officers testified isn't clear, and then they all meet in the living room, and the court found that that was enough for implied consent. I think, kind of parsing that apart, there's the one issue about whether Mr. Morrison actually appeared at the door. I didn't say he appeared at the door. He appeared from the bedroom at some point. Once they were already inside. We don't know that for sure. The only evidence that Mr. Morrison actually appeared in the bedroom before they came inside the door is the officer borderline's testimony, where he claimed that he actually asked Mr. Morrison for consent to enter through the threshold. Now, that is not only inconsistent with their prior reports, but it's not corroborated by any other evidence. It's another factual dispute in the case. Ms. Jupiter testified that's not what happened. And also, later at trial, the other officer testified that once they came in the house, Mr. Morrison came out of the bedroom. And so it's basically undermined by all of the other evidence in the case. But even setting that issue aside, the issue here is that the Fourth Amendment is meant to protect us in our privacy and to protect from intrusions by officers. And to prove consent, the government has to meet their burden of showing that there actually was consent and that there was voluntary consent by a preponderance of the evidence. And this is not a subjective analysis about, well, maybe the officer thought that he could come in at that point. This is an objectively reasonable analysis. Well, the court didn't make a subjective statement about it. I'm just wondering, isn't there a principle that you infer fact findings in favor of a court's conclusion? Or is there a different rule where you're talking about Fourth Amendment implied consent? I think you look at the evidence that is favorable toward the district court's ruling, for sure. I think the issue here is that they're the only factual findings that the court— Well, suppose the court had just—I mean, I'm just asking you this. Suppose the court didn't recite any facts, and at the end of the suppression hearing said, I find there was implied consent. How would we review that on appeal? Totality of the circumstances, right? Is she found there was implied consent based on Ms. Jupiter's opening of the door? No. Or just said— I'm just saying, bare bones. She recites an implied consent case, as she did in this case. She said, I have to find by the totality of the circumstances. I find by the totality of the circumstances there was implied consent. Then what would we do on appeal? I think then on appeal, you still look at the totality of the circumstances and you weigh out—you analyze whether she erroneously applied the law, in which case you're engaging in a de novo review of certain factual findings, or you look at the totality of the circumstances to find clear errors. But you're saying her factual findings are wrong, right? Yeah. I'm saying that her factual findings, some of them are incorrect based on her conclusion that all of the parties testified there was no forced entry. That was a clearly erroneous factual finding. But her legal conclusions— I thought you were saying she didn't resolve certain factual disputes. Right. And in the briefing, we outlined— Because she notes them and then basically says, however, these are the undisputed facts and that establishes consent. Right. And those undisputed facts that she found, specifically the fact she said that everyone agreed there was no forced entry, that was erroneous. But even assuming that wasn't erroneous, the facts that she relied on in reaching her legal conclusion of implied consent does not support a finding of implied consent under the law. And that's legally incorrect. I want to ask about your other argument you mentioned at the outset, Rahafe. Because of the stipulation that you sought, all the jury knew was that he had this prior felony. I mean, why isn't—how else are you going to prove someone knew they were a felon other than showing that they are a felon? I think circumstantial evidence certainly can be introduced, and this is something that's being litigated actively now, obviously. I think the court— Well, it's a waste of time when there's stipulations, in my view. But make your argument. Well, I think the issue is— Maybe we can solve that today. I think the issue is that a stipulation at the time of a trial, when you've already been charged and notified that you're a felon, doesn't say anything about somebody's knowledge at the time that they committed an offense. And so that alone can't support it. Well, the question I have about it is, I mean, is one of the other counsel planning to address that issue? Is that why you— The Rahafe issue applies to two of the litigants, so— Well, I know, but I mean, your other counsel have a lot of time. I was just wondering if one of them had been planning to address Rahafe. I believe maybe briefly, but I can also address it more further on rebuttal. Well, you can on rebuttal. Okay. Sorry. Thank you. Mr. Theis or Theis? Theis. Theis. Thank you, Your Honor. May it please the Court, I am Peter Theis. I'm representing Mr. Session in this appeal. I'm on a first time in Houston. Thank you for the opportunity to argue before you.  charged with a crime. Whether it violated Federal Rules of Evidence 701 and 702. And the first thing I want to raise is that a lot of the agent's testimony was something I characterized as camouflaged expert testimony, clearly giving testimony that was within specialized knowledge of a narcotics agent. I can give examples. I give examples in my brief. I have record citations, but the ones I pointed to in my brief specifically went right to the amount of heroin, which was extremely prejudicial to my client. Because if you look at the context of the case, what the jury, it was very nuanced here, the jury acquitted Mr. Morrison of the conspiracy. With respect to the cocaine conspiracy, the jury found that there was not 500, I'm sorry, not 5 kilograms involved, it was 500 grams. So it didn't find the highest offense. So the jury was thinking about these issues. But what the difference between the cocaine conspiracy evidence and the heroin conspiracy evidence was this case agent's expert testimony that X term meant kilo amount. Now I'm just going to give some examples. The prosecutor, the government, asked the case agent, what does it mean when you see a stamp on some heroin package? And he says, not only does he say that's common for drug dealers and heroinists to do, that's clearly expert testimony based on his training. Who knows? We didn't get any voir dire. We don't know what that's based on. But it can't be based on his experience in this case, it's based on general knowledge. And he goes further and says that is the kind of, you only use that stamp if you're dealing with kilo amounts of cocaine. What, a stamp that said K? No, it was a scorpion stamp in this case. Oh, a scorpion means a kilo? So no, he said when people, when drug dealers stamp their material, that you're dealing with a drug dealer who deals with kilo amounts. The record citation for that is at 1820. And so that's just one example. Another example is this 55 to 60 that came up. This was a code word. This was discussed in the United States versus Hanes. What kind of knowledge is required to interpret? What is, when a narcotics, you know, in a conspiracy, what is happening when you set forth a number like 55 to 60? And Hanes said that was expert testimony, you need to be qualified to give that information. Here again, we had no qualification. The government based the entire testimony on lay testimony. That was their motion before the trial. This is all going to be lay opinion, no expert testimony, and indeed this case agent only had six years of experience. Who knows how many investigations he headed? So we don't know that. But he took that 55 to 60, and what does he, the government says, what does 55 to 60 mean? He says, that means a kilo of cocaine. And then he says, and the government says, well, what do you mean by 55, oh, it's 55,000 to 60,000. And that corresponds to the price on the New Orleans market. That is his expert testimony about what the market price is for heroin. That's not based on this investigation. He certainly didn't say it was based on this investigation. So they're putting it on all this extremely prejudicial evidence through this case agent as expert testimony, and there's been no safeguards put in place whatsoever. He wasn't qualified as an expert. I'm not sure he could be qualified as an expert based on his inexperience. He wasn't wardeered on how many investigations. He wasn't wardeered on anything. We would just get a lot of information in the direct about his training. Did you make an objection? So there were objections. The first objection came when the first code word came up, zip. Co-counsel jumps, objects, saying, this is expert testimony. This shouldn't be allowed. They haven't qualified this expert. And the government, they kind of have a back and forth with the court. The court says, no, it's based on his experience as a narcotics officer, which is lay opinion, which is contrary to Haines. So the district court wasn't thinking about it in the right framework. They kind of get around to, well, it's based on this investigation, so it's admissible. Then counsel says, well, he hasn't provided any context. He hasn't provided a foundation. He's not comparing it to other parts of this investigation, like in Haines, where it's like, OK, half, as mentioned here, that corresponded to a drug buy we had. So we know what that means. There's no specifics in here whatsoever in this testimony how that information came out. There's no foundation other than the fact that he was a case agent in this case and heard all the 100 calls. So it's our position that a foundation for the specific code word testimony as lay opinion has to be more than, I was the case agent and I heard hundreds of calls. It was, I was the case agent, heard hundreds of calls. And this is how I know this corresponds to this, because I heard it in this call, and I heard it in that call. And then we arrested this person, and he had that mouth. That's what happens in other cases. That's not what happened in this case. And counsel did object to that. Then later, they played a tape where my client and Mr. Staggers discussed a scale of nine. They discussed various code terms, two and two. They discussed crash test dummies. Again, counsel objects. It says, there has been no foundation for this whatsoever. The court simply overrules him. And then the case agent's allowed to testify. Well, a scale of nine, drug dealers, when they're talking about scales, they're talking about the quality of their product. They want to keep their customers coming. They want to make money. So it's important to make a profit. You have to have a quality product, et cetera, et cetera. All, obviously, general expertise not acknowledged. It's coming in as a lay opinion testimony. And I think this court clarified that in Haines, that is expert testimony for which you have to be qualified. I asked this court to decline the government's invitation to say, no, that's lay opinion testimony. I think the few cases that have come after Haines were very limited circumstances, isolated instances, nothing like a case agent example who's kind of giving, you know, he is the linchpin witness in this case. He's testifying at the end, right before the jury deliberates. He's putting in all the pieces together. And he's bringing to bear all his experience, his expertise. He's bringing back forth the knowledge of his case, parts of the record that aren't coming into trial to like bolster it. But all he did in this case was provide this general expert testimony for which he was not admitted for, as well as provide specific code terms without giving any foundation. In addition, he also asked one question. When he talks about this is the meaning of these various terms, is he saying that that's true in drug deals generally? Or is he saying that that's the code that they used in this drug deal? Well, if you look at the questioning, the framing of the questions was confusing. Sometimes it was based on your training and experience. Was it based on your training and experience? Does that mean experience in this case? Does that mean your general experience? So it was muddled. It was imprecise. It was coming in. But I think when you look at the answers, especially with the 55 to 60, I'm going to give you one more example here. There was a case where one of the clients said whole, used the word whole. And he testified that meant kilo. I mean, he didn't say how he knew that, what that was based on. Maybe that was based on his general experience as training. Maybe that was based on the investigation. We don't know. He didn't explain the basis. He just said that. Again, that's just one more example. And there's many more examples, but I'm just honing in on the part where he said my client was involved with a kilo, which resulted in the lifetime sentence for my client. And my colleague will discuss this. Respond to the government's argument that any error of this type was harmless. By my math, 981 grams of heroin were found when you add up what was found in Stagger's house and the Stash house. So you're at 981, almost at 1,000. Then you have phone calls. I mean, it's just not very likely that there were only two deals, or that what was recovered were the only drugs involved in the conspiracy. This is true. But those conspiracies, so it was the government's own theory that Staggers was the supplier and my client was the dealer. He would just come out and say that. And that just brings me up another example when he said paperwork. Paperwork means money. That means Session is the supplye and Staggers is the supplier. He just volunteers that. So on that theory, that Stash house could be Stagger's Stash house. We don't know Session's involvement in that portion. His material was found there. He is involved. But he might be involved in the cocaine conspiracy. And the other two co-defendants, they were involved in the cocaine conspiracy. They only testified they had no trafficking with heroin whatsoever. So I don't think it's automatic. Well, then how did they find him guilty of the heroin? I thought your quibble was with the amount, which gives the life sentence. Yes. Yes, well, he did say in a call that he was dealing with heroin. He did mention heroin once. So I don't think it's fair that the jury concluded that he was involved in the heroin conspiracy. Whether he was dealing in these kilo amounts, that was all the case agent. He was putting that out there. Well, how long did he investigate this? A couple of years, right? I'm not sure how long the investigation took. It was hundreds of calls. Yeah, hundreds of, no, over 2,000 calls. OK, thousands of calls then. Well, I do not quibble with the fact that he could lay a foundation for his specific code word, testimony, by pointing to, like, cross-pointing it. This call meant this. This call, this is how I know this. It was the government's burden to establish a foundation number 7-1-0-1. They didn't do so. He was just allowed to just kind of pull these things out of the air, then get. Was this a trial session did not oppose Morrison's testimony on the meaning of the code words, just the government's phrasing of questions? Is that an accurate characterization? Well, here's my recollection of how it occurred. This is the 1740 to 1741 of the record, is that co-counsel came up and made the objection I explained earlier. OK, this is a multi-defendant trial, multiple counsels. This defendant's standing up making this objection. He's having this back and forth with the court and the government. The court overrules his objection. At that point, my client's attorney gets up and makes an objection about the wording, a further objection. So I think it's fair to read that he certainly would have accepted that or wanted to be part of that objection, keeping this out entirely. But once that objection was overruled, he's like, well, I have something, a further objection that's related, but not the same. In order to clarify that, I think it was damage control at that point. So I would say he joined the objection. I'll reserve the rest for rebuttal. Thank you, Your Honor. Thank you. All right, Mr. McClellan. No, sorry, Chris Aberle. Go ahead. Morning, Chris Aberle for Court Appointed Counselor Andre Staggers. I wasn't going to talk about rehafe because the issue is a legal matter, straightforward, regardless of how it may ultimately be resolved. And because if Mr. Staggers is successful on that issue, as well as any other issues he's raised, I don't think he's going to get his $50 back. For your client, it makes no practical difference on the sentence. Correct. However, I'm happy to point out. Well, we'll leave it to Ms. Coon. It's all right. But I will just say on behalf of the question of whether a stipulation should just resolve the matter. And I think the question then is if somebody stipulates to having a prior felony conviction, does that count as evidence that he knew at the time he committed the crime that he was a prior felon? Didn't my panel talk with you about this a month ago? Yes, that's what I thought. The difference in that case is there was plain error in this one, perhaps not. And I think the only thing I could say is we require the government to prove that a gun has been traveling interstate commerce. And if they don't, then they fail. But what gun doesn't travel interstate commerce? Or that a bank is FDIC? So I think the argument is that the mere stipulation that there is a prior felony conviction is not sufficient. But how are you supposed to prove that knowledge, maybe other than a confession, but then the fact that they have, do have a felony? And then you can infer if people, felonies are serious things. People know if they have a felony. That's a fair inference for the jury to reach. Right. And in the case that I argued in front of Judge Jones last time, the situation was one where the defendant was given probation. He was 18. We're talking years later. Assault of a minor. They were three years apart. That was a legitimate question. So it could happen. So how do you prove it? Not often, but. Yeah. And because Rahafe was about immigration status, which can be a lot more foggy. There's so many different statuses you can have under the immigration laws. But Mr. Staggers was given a life sentence, a mandatory life sentence. And five weeks after he was sentenced, the law changed. The First Step Act came out, and persons in his shoes are subject now to a 25-year minimum. And what he is arguing on appeal is that that should apply to him because he's still on direct appeal. And given the nature of this issue and the time I have, I'm going to be more informational than argumentative. We recognize that all the circuit courts that have addressed this issue have held against us. I think it's three or four circuits. But what they've held is that the statutory language is sufficiently clear to evince Congress's intent that the statute does not apply to anyone for whom the district court sentenced them for the enactment date. But can't ignore the fact that the Supreme Court has issued three GBRs, one in January, instructing three different courts of appeals to address this issue that we're raising. I think the argument goes that there's sufficient ambiguity in the language that Congress's intent may actually have been to foreclose collateral challenges based on the amendments, but not to foreclose people who are on direct appeal. That a sentence is imposed when the sentence and conviction are final, which occurs when the appeal process is finished or when the time to take an appeal has expired. The court's going to want to look at three different things. First of all, one of those GBRs has already come back with an opinion from the Seventh Circuit. The Seventh Circuit held against the argument we're making. Clearly, there's going to be a cert petition filed in that case. The other one is Pearson. It's a Seventh Circuit case. It is currently before the Supreme Court on a petition for writ of certiorari. It is, to best of my knowledge, the first case to come before that court where this issue has actually been addressed by a court of appeals. It is distributed for conference this Friday. So the court will want to look at that. That case is mentioned in my 28J letter. And finally, there is another case before this court where this issue has been raised. The Gomez case was argued December 3rd or 4th. That's three months ago. I would anticipate the court would come out of the decision any day. I checked yesterday, and there hadn't been one. But the court, whatever, however this gets resolved, the court's certainly going to want to look at those things. And that's my information. Thank you. OK, Mr. McLaren. Good morning. May it please the court, Ryan McLaren for the United States. I'm joined this morning by Matthew Payne, who is trial counsel in this case. I want to respond to some of the court's questions. I want to respond to some of the opposing counsel's questions. I don't plan to take the full 30 minutes, but if the court has additional questions, I'm happy to answer those as well. I want to start, Judge Costa, you were talking about the Rahaif claim here. And you mentioned, isn't the old chief stipulation, might that be enough? I will say that since we filed our brief in this case, other circuits have said that, have looked at 922 trials, and have said that an old chief stipulation, that a jury can make the requisite inferences from that. I agree with Mr. Aberle that it would require an inference, that it's not obviously a stipulation as to the thing that's discussed in Rahaif. But the other courts have said that. I'm happy to file a supplemental letter with those cases if the court would like to see them. Yeah, I would. OK. And I'm happy to do that. I'll do that as soon as I get back to New Orleans. Judge Costa, you also asked, well, how in some of these cases would you be able to prove this knowledge requirement? I would say that in specifically 922g1 cases, felon and possession cases, if the defendant has spent more than a year in jail, which both of the defendants did in this case, that is certainly evidence that we had, that if Rahaif had happened before this case, we would have put that evidence before the jury. I agree that other subparts of 922g, it's a bit more of a challenge for us, g5, g9, cases like that. But certainly, that is evidence that we had in this case that we would have done. Why isn't the defense agreeing to a stipulation and invited error? I mean, that prevents the government providing more details, like how long the person was in prison, what the nature of the crime was, that would make it even easier for a jury to conclude the defendant knew. And I agree that it very well could be. That's a point that we argued in our brief as well. And among other things, it also makes the standard of review a bit messy. I mean, it is a sufficiency of the evidence after the trial. So ordinarily, it would be de novo. But if it's on an issue that no one was thinking about because the Supreme Court case hadn't happened yet, I think it makes that a little messy as well. Since Rahaif came out, I know it didn't apply at this trial. So that's why it was just treated like an old-fashioned felon in possession case. I assume defendants are still stipulating maybe to both or doing an old chief stipulation. Do you know how this has played out in these kind of trials since the decision came down? I don't know the answer to that. Just because our office, I don't think, has had a 922 trial since Rahaif came out. We had a 922 G9 trial. But that is a misdemeanor crime of domestic violence. So there's kind of more of a debate as to whether the person would have known that or not. Let me ask a dumb question here. Because I assume that whenever an individual is convicted of a felony, that in the process of pronouncing sentence or in the statement of the judgment, and I'm talking about state or federal, the court has to list the direct consequences of felony conviction, which include deprivation of the right to vote in many cases, deprivation of the federal right to own a firearm, whatever else there is. And I mean, why isn't this just de rigueur in the convictions for felony offenses? I think that in the majority of felon in possession cases, it's going to be pretty easy to prove it up. I'm not talking about felon in possession. Rahaif, I'm sure, applies across the board. And I mean, anybody who gets convicted of a felony has to know they've been convicted of a felony, with the possible exception of this real unusual 18-year-old sexual assault something. And I would say that I agree with that. There are some defendants. So why should we blink our eyes to the reality of the criminal justice procedures? I think that there are some criminal defendants in the state system who get suspended sentences, who maybe don't wind up doing any jail time on them. And there's at least an argument there. But I agree with you that in the majority of these G1 cases, that the evidence, I think, would be pretty clear. I mean, in federal court, it's a Rule 11 plea requirement to advise the defendant before pleading guilty of what rights that they'll give up with a guilty plea. Yes, sir, that's right. And there's also, in the state system, the Boykin forms and things. And I agree with Judge Jones that there is a guilty plea proceeding where the defendant's going to be advised of these things. So at the very least, in the felon possession cases like we have here, I think it's pretty clear what the evidence shows. I want to respond to some of the arguments about the suppression issue first. And then I'll move on to the drug evidence issue. And so with the suppression, looking at the evidence that was before the district court, that the officers knocked on the door. They confirmed that they were at the right house once Ms. Jupiter opened the door. They told her what they were there, what they wanted to do. We want to speak with Leonard. We want to talk to Mr. Morrison. She then opens the door a little further. A reasonable person looking at that exchange would conclude that that was implied consent. And that's really what this boils down to. Where do you see that the district court made a finding about this dispute about whether, really, two facts, whether the door was opened wider and whether she stepped aside and made any motion for them to come in? I agree with Ms. Kuhn, counsel for Mr. Morrison, in that there's not an express finding about that. But I think if you read the district court's order, particularly in the context of the case as a whole, Judge Jones, you pointed out the district court's statement in its new trial order. And I'll get to that in just a second. But if you look at what the district court found, she has to have credited the testimony of the officers. There can't be a finding of implied consent if she had credited Ms. Jupiter's testimony. Either the door was open, or either she opened the door. So you agree the finding of implied consent would have to require the door opening wider after the request to talk to him? Yes, I would. Because if Ms. Jupiter was closing the door and the officers, any reasonable person having a door closed on them would interpret that as, don't come into my house. So I have the order right in front of me. She talks about the disputed testimony. They testify differently. Then she says, however, testimony of all parties indicates there was no forced entry nor antagonistic response. Jupiter did not testify. They physically moved her out of the way. To the contrary, they waited in the living room while she went to get Morrison. The officers testified Jupiter did not verbally object. Thus, under the totality, she gave implied consent. And to me, she's then thus relying on no forced entry, no antagonistic response, no verbal objection. Yes, sir. So what I'm saying is that it would have made this a little easier if she had a sentence in there, if the district court had a sentence in there that said, I expressly credit the testimony of the officers over Ms. Jupiter. But I think you're right. Reading between the lines of what the district court said, it's pretty clear what she believed happened here. Well, she says. I mean, she cites the Griffin case. And then in the next, I think that's the Seventh Circuit case, then in the next, which is implied consent, then she states four things. All three of them testified that she opened the door halfway. That Bordelon and Jupiter both testified that Bordelon asked for Morrison. Then she says, both Bordelon and Bondolillo testified that Jupiter opened the door wider and stepped aside after Bordelon began speaking with Morrison, whom the officers say they saw in the hallway. I mean, to me, that's a finding. That's not just, well, this is disputed, but whatever. I mean, that's in support of the preceding paragraph. I agree with you, Judge Jones. I think it's pretty unambiguous what the district court thought happened here. And I'll point to, and Judge Jones, you brought this up, the, um. I guess it's just a strange order. I mean, usually you'd say, I credit the officers. I found them believable for this XYZ reasons. Yes, I agree. However, to me, it's like a summary judgment. There's these disputed facts. I don't need to decide them, however, because the undisputed testimony supports this result. But I mean, we can all read the order. I mean, we're not going to. We can all read the order and reach our own conclusions. Well, and the other thing that I wanted to point to, and Judge Jones, you brought this up. You asked, is there some kind of a different rule when we're inferring fact-finding in the suppression context? And I would say, no. This court often looks not only at the totality, but at the record as a whole. When there's a trial or that there's anything else in the record that would support it. And Judge Jones, you brought up Detective Biondolillo's testimony, or the district court's citation to Detective Biondolillo's testimony. It's at page 4684. And what the district court said was, the testimony of Jefferson Parish Sheriff's Office Detective David Biondolillo established that Morrison's wife, Shalanda Jupiter, voluntarily allowed the officers into the residence. So I think she, again, is making it pretty clear what she believes happened with this knock and talk. Unless there's any other questions about the suppression, I'd like to move on to the drug evidence. There's a couple of things worth pointing out with the drug evidence. Judge Costa, you brought up that there is a lot of evidence in this case. It's not just the agent's testimony. There is a lot of physical evidence that was obtained during the searches of Staggers' house and the Stash House, the house that had Sessions' identification cards in it, 900 grams of heroin seized from those houses. There's also the phone calls. And there's the one phone call in particular that I want to point out. That's the phone call between Session and a co-conspirator named Luis Cotto. We have the transcript of that phone call in our brief. In that phone call, Mr. Session says heroin. He says it out loud. He kind of messes up and doesn't use the code word. And in the context of the rest of the case, it's clear that they're talking about buying a kilogram of heroin during that phone call. So in addition to that physical evidence, the physical evidence in the phone call, I think a jury could reasonably infer, even without the agent's testimony, that this was a conspiracy for a kilogram or more of heroin. The other thing that's worth pointing out is that, and Mr. Tice brought this up, is that Haines was pretty clearly on everybody's mind before this testimony was coming in. The government filed a motion to eliminate before the trial saying, I intend, we intend to put the case agent on. We intend for him to give this testimony. That's at page 435 there. And I think the district court's order on that is at page 3296. Citing Haines, saying we recognize that this is what Haines said. We intend to comply with Haines. Before the agent took the stand at trial, there was a bench conference for the district. There's this bench conference that was cited here where the government said, again, we intend to put the case agent on. We intend for him to give this testimony. And the district court said, OK, I understand that's what you want to do. I believe this is going to be lay opinion testimony. Beyond all of that, looking at the agent's testimony, it's pretty clear that he was basically, they were reasonable inferences based on his experience as an agent, but also based on the work he did in this case. He was the case agent in this case. He says over and over again during his testimony that this is based on work I did in this case. I've seen the physical evidence. I did the surveillance. So it's based on a little bit of both. It's experience that he has as a DEA agent who's investigating the LaPlace area, who's two individuals who has listened to thousands of phone calls. Judge King, you asked a question about whether the agent's testimony was specifically to this case and whether it was some things that applied broadly in the drug context. I would say that his testimony does a little bit of both. But when it comes to the terms that he's interpreting, when he's listening to the phone calls and saying that word means this, that word means that, that is specific to this case. It's like gator meat in this case means heroin. It's that when they're saying, I need some of this, that there, the phone call between London and Morrison, they're talking about heroin. So when it comes to the terms, that's specific to this case. There are some other things that are more tools of the trade, testimony about the drug presses and things like that, that are a little broader. But even that stuff is all reasonable inferences that are, again, based on his experience as an agent and his work on this case. Opposing counsel brought up the testimony about the drug price. 55 is the price of a kilogram of heroin in the New Orleans area. I would say that that's a reasonable inference for an agent who works in the New Orleans area, that that doesn't require any kind of special expertise. It's just his feet on the ground, on the job experience as an agent. I don't think that the 700 rules require that an agent check his experience at the door. When he comes up and testifies on the stand, he shouldn't put on blinders and pretend like he doesn't know the price of heroin in the New Orleans area. He also happens to be the case agent on this case. So when presented with that evidence, I think it's a perfectly reasonable inference for him to say, this is what I believe it is. Unless there's any further questions about either the drug evidence or? Well, what about the First Step Act? With the First Step Act, I agree with Mr. Aberle that all the courts that have looked at it have adopted the government's position on it. It's certainly nice that they have. I don't know if it's necessary for this court to look at what the other courts have done. It's a pretty plain statutory interpretation issue for me. Imposed has a certain meaning. It's different from finality. A general understanding of imposed is that it's when the gavel comes down at sentencing. It's a different legal understanding than what finality is. It's a pretty straightforward statutory interpretation. Give me an example of a statute that would not apply, that would apply to pending convictions. Pending convictions. I don't know if I can think of one unless Congress has said specifically. And I think that's the import of Dorsey and of the Savings Clause, is that Congress would have to specifically say, and I don't know that I can think of one where they have done that. Well, this is out of step, so to speak, with the way statutes are normally interpreted. That's right. And that's our position in the brief. And I can say the department's position nationwide is that unless Congress says something different, then the general rule is for statutes to be forward looking. And I should correct something with pending convictions. Obviously, the First Step Act applies to things that have not yet been imposed. So they could be pending, but not pending up on appeal. Well, that's possible too, but wait a minute. These are pending on appeal. Right, pending on appeal. I think different than I've been convicted at trial and I haven't been sentenced yet. So unless there's any further questions, I would ask that the court affirm the convictions and the sentences. Thank you. Thank you, sir. Ms. Kuhn. I'd like to revisit a couple of things about the suppression issue, and then I'll move on to rehafe very briefly. I disagree that there is an implicit credibility finding, first of all, between Ms. Jupiter's testimony and the officers. But as Judge Costa said, that's something that everyone can read the order and make their decision. But even if setting that aside, viewing the facts in the light most favorable to the district court's ruling, the testimony from the officers cannot possibly support a finding of consent. And that's based on decades of precedent, both in the Supreme Court and in this court. And I'd urge the court to review both Johnson, the Supreme Court case, that's 333 U.S. 10, where there was a nearly identical scenario where the officer testified that the occupant of a hotel room stepped back acquiescently and admitted the officers in, and the Supreme Court said that was a Fourth Amendment violation. And then similarly, like I said, there's several cases cited in the briefing, but Cantu, a Fifth Circuit case unpublished, actually found a similar factual scenario, or sorry, found to be an obvious violation. When officers asked someone if the luggage belonged to her, she affirmed, and then they proceeded to search it, and she didn't give any objection. And so even though that's in a luggage searching context rather than admission, I think that's an analogous scenario that shows the Fifth Circuit recognizing that this is a clear, longstanding principle in Fifth Circuit precedent, that not requesting consent and then simply proceeding with an entry is not permissible. But even if the court could somehow find her actions based on the officer's testimony to provide implied consent in some fashion, the government didn't even provide any evidence about voluntariness. And in fact, in their post-hearing briefing at ROA 4121 to 25, they relied exclusively on Mr. Morrison's purported permission to Officer Bordelon to come in. They didn't even argue the issue of voluntariness with respect to Ms. Jupiter, and when she was on the stand at the suppression hearing, they didn't even ask her if she understood that she could refuse consent or ask her about her background. And instead, the district court looked to the lack of evidence as support for its voluntariness finding. The government completely failed to even try to meet its burden in that respect. And so even if there could be some construction of implied consent based on the facts from the officers, there was a complete failure to meet the burden of showing voluntary consent. Now briefly, with rehafe, just to answer one of the court's questions before, I don't know if this is a formal practice, but it's my understanding that in the district court now, they have been doing some stipulations, or at least in the wake of rehafe, they were doing stipulations about knowledge in order to secure those convictions. But the issue here is not whether what evidence could be presented at a trial to prove that knowledge element. It's what was presented at Mr. Morrison's trial. And here, we have the old chief stipulation and the fact that the gun was in his closet, which isn't enough. And in fact, there's evidence supporting that he actually offered it. Isn't this really just a jury instruction issue? I mean, to treat it as sufficiency of the evidence seems weird to me. We're saying, was there sufficient evidence for the jury to make a finding it never made? I think it's odd, but I think it's true. The issue is really, the district court didn't instruct the jury. The defense didn't ask for that instruction on that element, which the Supreme Court hadn't established as an element. So it seems to me that's the framework. It is an odd framework, but it has been applied before. And actually, as the government mentioned in its briefing, in other cases, or at least in other circuits, when there's this kind of change in the law that comes after trial, the government's correct from the majority of opinions I've seen, they've actually remanded for a new trial rather than reversing the conviction. So I would agree that for the rehafe issue, that would be the problem. On a felon in possession, as opposed to an alien in possession? No, I'm sorry. For an analogous context, where there's a change in the law by the Supreme Court. Correct. Have there been any 922 G1s vacated because of rehafe that you know of? Not that I have seen. I believe most of them, I believe I've seen some cases that were up on the Supreme Court that were just remanded fixes consistent with rehafe. Ms. King, what about the practical argument that I mentioned to you, that every court in the United States, when accepting a guilty plea, has to inform the defendant of the consequences of the guilty plea, or every judgment in the United States has to inform of the consequences? So as a practical matter, I don't see how you could ever have reversible error, except in these real unusual kinds of felony convictions. Well, and I think the issue is that certainly circumstantial evidence can show it. And these fellows, I mean, these fellows had spent as much time in prison as they had in the free world before they got caught here. Staggers and Sessions, anyway, or Morrison. Not in Mr. Morrison's case. I know that he had some overlapping convictions, and there was probation terms and such. And I don't disagree that circumstantial evidence could potentially support an actual jury finding, when they're instructed properly, that he knew of his status. But I think the issue here is also that there's a due process issue when you are prevented from actually providing any kind of defense or making any kind of argument. And in this case, we do have a government that was prevented. You could have, I mean, what prevented the defense from arguing whatever it wanted? Well, both sides. It was the government that was prevented from arguing the evidence that would have shown their knowledge via the stipulation. Correct. But then to rely on either the stipulation or some kind of harmless error analysis by looking at the record as is, it precludes the defense from making any kind of argument to the contrary that he lacked the requisite knowledge. And as I discussed in the briefing, there was evidence in the record that he actually showed the officers where the gun was and explained to him how he found it and where it was. And that, to me, that alone shows that you can't find beyond a reasonable doubt, or there should be reversible error in this case on the jury instruction. But the deprivation of the ability to provide a defense is also a due process issue that would need to be remanded. Thank you. OK. Thank you very much. We note that Mr. Tice and Mr. Aberle are court-appointed. And of course, you've done a very good job for your clients at a reduced rate. And we certainly appreciate it. Thank you very much. Does he get more time? Pardon me? Does Tice get more time? Oh, did you get? I'm sorry. Did you want the bottle? Sorry about that. I'm just assuming you did a good job. I'm not that good. I'm worried about my briefs. Rather than my work. But I will say just one thing to Mr. McLaren's saying that we don't check the case agent's experience at the door. We're not asking that. We're asking that when they do bring their experience to the trial, that if it is going to be expert testimony, they subject themselves to the rigors of 701 and 702, because that's what they're there for. And the fairness of the trial depends on it. So we shouldn't. I submit we shouldn't play loosey-goosey with these rules and say, well, you know, it's OK in this case because it's natural for him to do it. The rules are there for a reason. And in this case, I think it has significant prejudicial impact. Thank you. OK, thank you.